UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEONTAE J. GORDON,

    Plaintiff,

v.

Case No. 22-cv-11873
Hon. Matthew F. Leitman

KIM CARGOR, *et al.*,

    Defendants.
_____/

**ORDER (1) ADDRESSING BOTH RECOMMENDED DISPOSITION OF REPORT AND RECOMMENDATION (ECF No. 64) AND PLAINTIFF'S OBJECTIONS THERETO (ECF No. 65); AND (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 56)**

*Pro se* Plaintiff Deontae J. Gordon is a state inmate in the custody of the Michigan Department of Corrections (the "MDOC"). In this action, Gordon brings claims under 42 U.S.C. § 1983 against several officials employed by the MDOC. (*See* Compl., ECF No. 1.) Two of Gordon's claims remain alive. In the first claim, he says that for a three-month period during the COVID-19 pandemic, some of the remaining Defendants failed to transfer him into a facility that offered meals consistent with his religious beliefs (the "First Amendment Claim"). In the second claim, he asserts that some of the remaining Defendants failed to provide him with sufficient hygiene-related products and services (the "Eighth Amendment Claim").

1

The Defendants have filed a motion for summary judgment on these remaining claims. (*See* Mot., ECF No. 56.) The assigned Magistrate Judge issued a Report and Recommendation ("R&R") in which he recommended that the Court grant the motion. (*See* R&R, ECF No. 64.) Gordon has now filed objections to the R&R. (*See* Obj., ECF No. 65.) For the reasons explained below, the Court concludes that the Defendants are entitled to summary judgment. It therefore **GRANTS** their motion.

**I**

The factual background of this case is fully set forth in the R&R. (*See* R&R, ECF No. 64.) The Court adopts and incorporates that background here. The Court recounts only the most basic facts necessary to understand the Court's ruling on Gordon's objections to the R&R.

**A**

Gordon's claims relate to alleged acts and omissions that occurred during the COVID-19 pandemic. During that pandemic, the MDOC established protocols to be followed when inmates in its custody had to leave one of its facilities. Under those protocols, "any current prisoner who left a facility on [a] writ . . . would be routed back through [Charles E. Egeler Reception & Guidance Center ("RGC")] before being released to a general facility." (Cargor Resp. to Pl.'s Interrog. No. 2, ECF No. 56-3, PageID.614.) The MDOC routed those inmates through RGC so that

they could be quarantined for a period of at least 14 days before returning to the general population at the facility at which they were housed. (*See* Director's Office Memorandum 2020-30R6, at 3 (Aug. 27, 2020).[1]) Pursuant to the protocols, once a prisoner was medically cleared for transfer, his information was sent to the Deputy Director of the MDOC for final transfer approval. (*See* Malloy Resp. to Pl.'s Interrog. No. 3, ECF No. 56-5, PageID.629-630.) The Deputy Director alone approved the final transfer decisions. (*See id.*; *see also* Director's Office Memorandum 2020-30R6, at 5.)

The MDOC adopted these protocols to guard against inmates returning to their facilities while infected with the COVID-19 virus.

**B**

In 2020, Gordon was incarcerated at the Carson City Correctional Facility. (*See* Compl., ECF No. 1, PageID.12.) On October 1, 2020, he was "writted" from that facility to the Kent County Jail for an evidentiary hearing in connection with his criminal case. (*See id.*; *see also* Gordon Dep. at 11:3-16, ECF No. 70, PageID.905.) When his criminal proceedings concluded, pursuant to the MDOC protocols identified above, Gordon was "transferred to" RGC. That transfer occurred on October 6, 2020. (*See* Compl., ECF No. 1, PageID.12.)

---

[1] *See* https://www.michigan.gov/-/media/Project/Websites/corrections/publications/Folder6/dom_2020-30r6_final.pdf.

Consistent with the MDOC's COVID-19 protocols, when Gordon arrived at RGC, he was subject to the quarantine period applicable to all inmates assigned to RGC before they returned to general population. (*See* Director's Office Memorandum 2020-30R6, at 3.) When that period concluded, Gordon's name was submitted to the Deputy Director of the MDOC for transfer on a weekly basis. (*See* Emails, ECF Nos. 56-13, 56-14.) But before the Deputy Director approved him for transfer, in November of 2020, Gordon's unit at RGC suffered a COVID-19 outbreak. (*See id.*) Gordon, himself, contracted COVID-19. (*See* Obj., ECF No. 65, PageID.817.) At that point, Gordon was not eligible for transfer until he received medical clearance. (*See* Director's Office Memorandum 2020-30R6, at 2-3, 6.) He received that clearance on January 4, 2021 (*see* Emails, ECF No. 56-13, PageID.709-711), and the MDOC Deputy Director approved his transfer on January 6, 2021 (*see id.*, PageID.712). On January 7, 2021, Gordon was transferred out of RGC. (*See* Transfer Order, ECF No. 56-6.)

### C

Gordon is a "registered Buddhist" and has accordingly "been authorized to eat from the MDOC Religious Menu as a 'Vegan' for several years." (Compl., ECF No. 1, PageID.12.) It is undisputed that RGC does not offer vegan meals (*see* Mot. for Summ. J., ECF No. 56, PageID.524), and that as a result, Gordon was not provided meals consistent with his religious beliefs during his time at RGC. Gordon claims

4

that when he arrived at RGC, he "kited the chaplain, food service director, and . . . others" to request vegan meals. (Gordon Dep. at 21:3-5, ECF No. 70, PageID.915.) When they did not respond, he "kit[ed] . . . administrative figures like the wardens, the . . . deputy wardens, the [Resident Unit Manager], . . . everybody" with the same request. (*Id.* at 21:5-9.) Gordon claims he "informed them that [he] was a Vegan and that he needed to be immediately transferred back to" the Carson City Correctional Facility "and/or accommodated thru the dietician." (*Id.*) Gordon further alleges that the Defendants "not only had the authority to order [his] transfer, but [were] obligated per MDOC policy to do" so. (*Id.*)

**E**

Gordon also claims that while he was incarcerated at RGC, some of the Defendants either completely denied, or provided insufficient access to, a number of hygiene related products and services. More specifically, Gordon contends the following:

- He was deprived of soap, toothpaste, and deodorant for three weeks (*see* Compl., ECF No. 1, PageID.15; Gordon Dep. at 40:23-25, ECF No. 70, PageID.934);

- Based upon the laundry schedule at RGC, his clothes were washed only once per week (*see* Gordon Dep. at 48:3-51:18, ECF No. 70, PageID.942-945);

5

- Toilet paper was issued on a "one roll of [toilet] tissue per week, no exceptions" basis (*id.* at 66:11-23, PageID.960);

- He was not able to purchase shower shoes from the store for approximately three weeks (*see id.* at 25:20-28:14, PageID.919-922); and

- He was deprived of hot water in his cell for one week (*see id.* at 64:25-65:3, PageID.958-959).

F

On August 12, 2022, Gordon filed this action under 42 U.S.C. § 1983 against several officials employed by the MDOC. (*See* Compl., ECF No. 1.) He asserted several constitutional claims against the Defendants. (*See id.*) As noted above, Gordon's two remaining claims are the First Amendment Claim and the Eighth Amendment Claim. In the First Amendment Claim, Gordon alleges that Acting Warden Cargor, Deputy Warden Jarrett, Deputy Warden Malloy, Deputy Warden Howard, Resident Unit Manager Pearl, and John/Jane Doe Transfer Coordinator (the "First Amendment Defendants") violated his First Amendment rights when they failed to transfer him out of RGC and into a facility that offered vegan meals. In the Eighth Amendment Claim, Gordon contends that Cargor, Jarrett, Malloy, Howard, Pearl, and Facility Manager Murray (the "Eighth Amendment Defendants") violated

6

his Eighth Amendment rights when they deprived him of hygiene products, toilet paper, laundry services, shower shoes, and hot water.

The Defendants filed a motion for summary judgment. (*See* Mot., ECF No. 56.) In that motion, they argued that all of Gordon's claims failed on the merits and, in addition, that they were entitled to qualified immunity on all of the claims. (*See id.*, PageID.544-546.) Gordon's response focused almost entirely on the merits of his claims and said very little about the Defendants' qualified immunity defense. Gordon's discussion of qualified immunity did not cite a single case. (*See* Resp., ECF No. 58, PageID.730.) Instead, that section provided, in its entirety:

> **DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.**
>
> It is undisputed that Plaintiff has a 1st Amendment right to freely exercise his religious beliefs and a[n] 8th Amendment right to humane living conditions.
>
> Defendants make a mockery of the Covid-19 pandemic averring that due to the pandemic, they were not allowed to [do] any transfers. However, Exhibit A shows that inmates by the dozens were being transferred [during] the time in question. In fact Defendants are refusing via discovery to produce the transfer history during the relevant times. Which ultimately will establish that **hundreds** of inmates were being transferred.
>
> Defendants have violated clearly established law as outlined herein, and should have known they were. Wherefore, abrogating their qualified immunity as a government agent.

(*Id.*; emphasis in original.)

7

The assigned Magistrate Judge thereafter issued the R&R in which he recommended the Court grant the motion. (*See* R&R, ECF No. 64.) The Magistrate Judge did not reach Defendants' qualified immunity defense. Instead, he based his recommendation upon his analysis of the merits of Gordon's claims.

The Magistrate Judge concluded that the First Amendment Defendants were entitled to summary judgment on the First Amendment Claim because Gordon failed to show that any of them "had the authority to effectuate his transfer during the relevant time period." (*Id.*, PageID.803.) He then determined that the Eighth Amendment Defendants were entitled to summary judgment on the Eighth Amendment Claim because Gordon failed to show that (1) they were responsible for denying Gordon's access to the hygiene-related products and services Gordon identified and/or (2) that the alleged deprivations rose to the level of Eighth Amendment violations. (*See id.*, PageID.804-811.)

Gordon has now filed objections to the R&R. (*See* Obj., ECF No. 65.)

## II

When a party objects to portions of a Magistrate Judge's report and recommendation, the Court reviews those portions de novo. *See* Fed. R. Civ. P. 72(b)(3); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 661 (E.D. Mich. 2004). The Court has no duty to conduct an independent review of the portions of the R&R to which the parties did not object. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985).

8

III

The Court addresses each of Gordon's claims separately below.

A

The Court begins with the First Amendment Claim. As noted above, the Magistrate Judge concluded that the First Amendment Defendants are entitled to summary judgment on that claim because none of them had the authority to transfer Gordon to a facility that served vegan meals. Gordon disputes the Magistrate Judge's conclusion that the First Amendment Defendants did not have the power to transfer him. He points to two pieces of evidence that, he says, create a question of fact as to whether the First Amendment Defendants did have that authority. The Court will address each piece of evidence separately.

1

The first piece of evidence that Gordon identifies is an email dated October 21, 2020, from Defendant Malloy to Defendants Cargor and Howard (the "October 20 Email"). Gordon contends that the October 20 Email shows that the First Amendment Defendants were "in control of the transfers and 'transfer pools' and thus dictated who stayed and who left." (Obj., ECF No. 65, PageID.815.) It does not.

Gordon relies on the following portion of the October 20 Email:

> From: Malloy, James (MDOC) <PII @michigan.gov>
> Sent: Wednesday, October 21, 2020 9:19 AM
> To: Cargor, Kim (MDOC) <PII michigan.gov>; Howard, Jeffrey D. (MDOC) <PII @michigan.gov>
> Subject: Transfer Pools
>
> Warden Cargor,
>
> With Current Intake numbers if we don't ship next week we will have to use a transition unit (Closed Unit) as General Population. We have currently have 27 available beds in General Population. See below Transfer Pools to Include specific Level Vs and WRIT Returns.

(October 20 Email, ECF No. 56-13, PageID.693.) Gordon emphasizes Malloy's use of "we" in connection with transferring prisoners, and Gordon suggests that this email, along with other similar emails (*see, e.g.*, 10/27/20 Email, ECF No. 56-13, PageID.695), are admissions that Defendants Malloy, Cargor, and Howard had the power to transfer him. He says that those Defendants must have had the power to transfer him because they would have had no other reason to "be sending such emails amongst each other." (Obj., ECF No. 65, PageID.816.) The Court disagrees with Gordon's reading of the October 20 Email.

First, the October 20 Email is simply a report on the capacity of RGC at the time in question. Nothing in the email suggests that Defendants Malloy, Cargor, and Howard had the authority to determine who was transferred and when.

Second (and more importantly), Gordon ignores both the remainder of the October 20 Email and a series of related emails – all of which confirm that the Eighth Amendment Defendants did not have the authority to transfer him. The remainder of the October 20 Email (1) identified those inmates who had been medically cleared for transfer (*see* bottom portion of October 20 Email) and (2) indicated that the email

10

was forwarded to the MDOC Deputy Director so that *he* could review the list of cleared inmates and determine which of them would be transferred (*see* top portion of October 20 Email). (*See* October 20 Email, ECF No. 56-13, PageID.693.) The October 20 Email is thus fully consistent with the Eighth Amendment Defendants' contention that the Deputy Director had the sole authority to approve transfers and that the Eighth Amendment Defendants did not have that authority. The October 20 Email therefore does not create a material factual dispute as to whether the Eighth Amendment Defendants had such authority. Accordingly, Gordon's objection based on the October 20 Email is **OVERRULED**.

## 2

Gordon next identifies what he believes is a "SMOKING GUN" showing that Defendant Cargor had the authority to transfer him and failed to do so. (Obj., ECF No. 65, PageID.817.) The "SMOKING GUN," according to Gordon, is Cargor's statement that "she submitted Gordon's information to the Deputy Director on January 4, 2021 (the day Gordon was alleged medically cleared), and consequently Gordon was approved for transfer by the Deputy Director on January 6, 2021, and transferred out on January 7, 2021." (*Id.*)[2]

---

[2] Gordon does not cite a particular statement by Cargor to this effect. The Court surmises that Gordon may be referring to a portion of the Defendants' motion for summary judgment, in which they describe the emails and timeline related to Gordon's transfer. (*See* Mot., ECF No. 56, PageID.536-537, citing Emails, ECF No. 56-13, PageID.709-712.)

11

Gordon says that Cargor's statement is significant for two reasons. First, he says that the statement "shows she indeed had the authority to submit Gordon's name and effectuate his transfer." (*Id.*)  Second, he says that the statement shows that she failed to timely exercise that authority. In support of that contention, he highlights Cargor's "admission" that she did not take action to transfer him until January 4, 2021, and he says that that is an admission of a delay because he "would have been medically cleared for transfer" roughly one month earlier, on December 4, 2020.[3] (Obj., ECF No. 65, PageID.817.)

There are two problems with this line of argument. First, Cargor's submission of Gordon's name for transfer once he was medically approved for a transfer does not show or suggest that she had the authority to transfer Gordon. Her statement shows only that she could submit inmates for transfer consideration by the MDOC Deputy Director once they were medically cleared.

Second, Gordon does not cite any actual evidence that he was medically cleared for transfer one month before Cargor submitted his name for consideration by the MDOC Deputy Director. He simply assumes that he "would have been" medically cleared for transfer as of that date because that date was 14 days after he

---

[3] Here is how Gordon landed on the December 4, 2020, clearance date. He says that he was diagnosed with COVID-19 on November 19, 2020, and that under the MDOC's protocols, he should have been cleared for transfer 14 days later – which is December 4, 2020. (*See* Obj., ECF No. 65, PageID.817.)

was diagnosed with COVID-19, and "[i]nmates and patients were medically cleared [for transfer] after 14 days of contracting" COVID-19. (Obj., ECF No. 65, PageID.817.) But Gordon does not cite any evidence that could support a finding that inmates were cleared for transfer 14 days after contracting COVID-19. And the evidence submitted by the Defendants suggests that there was no fixed 14-day time period for medically clearing inmates who had contracted the virus. For instance, the Director's Office Memorandum explains that prisoners who "test positive for COVID-19" shall be placed in a "designated isolation area" and "shall only be released from an isolation area after they have been cleared by a Physician, and [obtained] approval from" medical administrators. (Director's Office Memorandum 2020-30R6, at 2-3.) That memorandum says nothing about a specific time for medical clearance of inmates who have contracted the virus.[4] The bottom line is that Gordon has failed to submit any evidence that he was (or should have been) medically cleared for transfer 14 days after he contracted the virus in November of 2020. For all of these reasons, he has failed to show (1) that he was

---

[4] The Director's Office Memorandum does reference a 14-day time period of isolation for individuals who had "close contacts" with other individuals who were infected with COVID-19. (*See* Director's Office Memorandum 2020-30R6, at 3.) But Gordon did not merely have "close contact" with an infected individual on November 19, 2020. Instead, as he acknowledges, he was actually infected with the virus at that time. (*See* Obj., ECF No. 65, PageID.817.) Thus, the 14-day period mentioned in the Memorandum did not apply to Gordon.

13

eligible for transfer on December 4, 2020, and (2) that Cargor could have and should have submitted his name for transfer out of RGC at that time.

Accordingly, Gordon's "SMOKING GUN" objection is **OVERRULED**.

**B**

The Court next turns to Gordon's Eighth Amendment Claim. In the Eighth Amendment Claim, Gordon alleges that, for a period of up to three weeks, the Eighth Amendment Defendants were deliberately indifferent to his need for toilet paper, hygiene products (*e.g.*, soap, toothpaste, and deodorant), laundry services, shower shoes, and hot water. As noted above, the Magistrate Judge addressed this claim on the merits even though the Defendants asserted a qualified immunity defense to the claim. The Court, however, concludes that there is no need to reach the merits of the claim. Defendants are plainly entitled to qualified immunity on the claim because Gordon has not cited a single case in which any court has held that the deprivation of toilet paper, hygiene products (*e.g.*, soap, toothpaste, and deodorant), laundry services, shower shoes, and/or hot water, under circumstances like those presented in this case, violated the Eighth Amendment.[5] Indeed, Gordon has not cited a single case that even addresses or involves the deprivation of any of these

---

[5] Even though the Magistrate Judge did not address Defendants' qualified immunity defense, it is permissible and appropriate for this Court to do so. The Defendants raised that defense in their motion for summary judgment, and Gordon had a full and fair opportunity to respond to it – and he did offer a response to it – in his opposition to Defendants' motion.

things. Instead, he simply asserts that it is "undisputed that [he] has . . . an 8th Amendment right to humane living conditions." (Resp., ECF No. 58, PageID.730.) That is not enough to overcome Defendants' qualified immunity defense. *See Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (explaining that in order to defeat a qualified immunity defense, a plaintiff must, among other things, cite case law with a similar fact pattern showing that the particular constitutional right underlying his claim is "clearly established"); *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024) (explaining that for purposes of qualified immunity, a plaintiff may not identify a "clearly established" right at a high level of generality). The Eighth Amendment Defendants are therefore entitled to qualified immunity on the Eighth Amendment Claim.[6]

## IV

For all of the reasons explained above, **IT IS HEREBY ORDERED** as follows:

---

[6] The Court recognizes that, as an inmate, Gordon may not have unrestricted access to legal materials and may be limited, to some extent, in his ability to locate and cite case law. However, Gordon's response to Defendants' motion for summary judgment reveals that he did have access to legal materials. He cited and addressed cases (including unpublished cases available through LEXIS) concerning, among other things, the summary judgment standard, liability for failure to transfer an inmate, supervisory liability under Section 1983, and omission-based liability under Section 1983. (*See* Resp., ECF No. 58, PageID.724-725, 729.)

1. Gordon's objections to the Magistrate Judge's recommended disposition of the First Amendment Claim are **OVERRULED**;

2. Gordon's objections to the Magistrate Judge's recommended disposition of the Eighth Amendment Claim are **TERMINATED AS MOOT** in light of the Court's decision to resolve that claim on the basis of qualified immunity, rather than on the basis recommended by the Magistrate Judge; and

3. Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: August 7, 2025

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 7, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126